# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| Martin S. Rood, | Case No.: 2:16-cv-002586-JAD-NJK |
| Plaintiff | **Order Granting Summary Judgment in favor of Defendant** |
| v. | [ECF Nos. 38–39] |
| Liberty Insurance Underwriters, Inc., | |
| Defendant | |

Plaintiff Martin Rood purchased a 50% stake in a commercial loan intended to refinance a loan encumbering parcels of vacant land in downtown Las Vegas that its owner intended to develop into a high-rise condominium building. The development eventually failed, and Rood discovered that the appraisal of the land that he relied on in deciding to invest had grossly exaggerated its value. So, he sued the appraisers and received a judgment against them. One of those appraisers, Jack Gillespie, had a professional-liability insurance policy issued by defendant Liberty Insurance Underwriters, Inc. But Liberty refused to defend Gillespie or indemnify him because it believed that two separate exclusions in its policy barred coverage. Rood received an assignment of Gillespie's rights against Liberty and now stands in Gillespie's shoes to sue Liberty. Because I previously granted Liberty's motion to dismiss in part, the only remaining claim is breach of the insurance contract.

Both sides move for summary judgment. I find that at least one of the exclusions to Liberty's policy applies because that provision clearly excludes coverage for appraisals of vacant land purchased for the proposed purpose of building large apartment or condominium developments, and the undisputed facts show that Gillespie valued the land based on a zoning

variance that would have allowed its owner to build a high rise. I therefore grant summary judgment in favor of Liberty and deny Rood's motion.

**Background**

Cielo Vista, LLC owned the parcels of land at issue and sought a commercial loan from Hallock Ryno Investments, Inc. (HRI) to pay off an existing loan.[1] HRI eventually provided $1.6 million in financing but first sought out other investors to purchase portions of the loan.[2] HRI provided potential investors, including Rood, with a "specific offering circular," which included details about the loan and an appraisal report commissioned by HRI and authored by Gillespie and his fellow appraisers.[3]

This report appraised the land "'[a]s-[i]s' with all approved zoning changes and Use Permits in place" and valued it by comparing the land to other recently sold parcels that had—at least according to the appraisers—comparable characteristics.[4] As part of this "Sales Comparison Approach," the report assessed the "Highest and Best Use" of the land.[5] Based on local market conditions and the fact that the city had granted a special-use permit for "mixed-use development" of the land, the report concluded that its most profitable use would be the development of a high rise composed of both residential units and commercial space.[6] Gillespie

---

[1] ECF No. 41 at 9 ("Use of Proceeds: Payoff existing $1,019,000 loan to Viking Capital[.]").
[2] *See id*. at 3–5 (cover letter to specific-offering circular).
[3] *Id*. at 6 (table of exhibits to circular); ECF No. 46-6 (Gillespie appraisal report).
[4] *Id*. at 7.
[5] *Id*. at 83.
[6] *Id*. at 83–84.

and his fellow appraisers ultimately valued the land at nearly $5.5 million,[7] and Rood relied on this appraisal in deciding to invest $800,000 for a 50% interest in HRI's loan to Cielo Vista.

The high-rise development eventually fell through, and Rood lost his investment once the land was sold in foreclosure. In 2010, Rood commissioned his own "retrospective" appraisal of the land, which found that it would have been worth only $2.2 million in 2006.[8] He therefore sued Gillespie and the other appraisers who authored the original report, alleging negligence and professional malpractice. A different judge in this district granted Rood summary judgment and awarded him damages against the appraisers.[9] Although Gillespie held a professional-liability policy with Liberty, it declined to defend or indemnify him because (in Liberty's view) Gillespie's appraisal triggered two of the policy's coverage exclusions. Gillespie eventually assigned his claims to Rood, who now sues Liberty.

## Summary-judgment standard

Summary judgment is appropriate when the pleadings and admissible evidence "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[10] When considering summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.[11] If reasonable minds could differ on material facts, summary judgment is inappropriate because its purpose is to avoid unnecessary trials when the facts are undisputed, and the case must then proceed to the trier of fact.[12]

---

[7] *Id.* at 4.

[8] ECF No. 43 at 4 (DiFederico report).

[9] 2:12-cv-00893-GMN-NJK, ECF No. 87.

[10] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)).

[11] *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

[12] *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

If the moving party satisfies Rule 56 by demonstrating the absence of any genuine issue of material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts showing that there is a genuine issue for trial."[13] "To defeat summary judgment, the nonmoving party must produce evidence of a genuine dispute of material fact that could satisfy its burden at trial."[14]

**Discussion**

Liberty asserts that two separate exclusions preclude coverage for Gillespie's professional malpractice stemming from his 2006 appraisal. If I find that either exclusion applies, then Liberty did not breach its insurance contract with Gillespie by refusing to defend or indemnify him and is thus entitled to summary judgment. The parties agree that contract interpretation is a question of law[15] and that insurance contracts in Nevada must "be interpreted broadly, affording the greatest possible coverage to the insured."[16] Thus, "[a]ny ambiguity in an insurance contract must be interpreted against the drafting party and in favor of the insured."[17] "Whether an insurance policy is ambiguous turns on whether it creates reasonable expectations of coverage as drafted."[18]

Under Exclusion N to Gillespie's insurance contract, liability coverage is excluded for any claim "based upon or arising from Professional Services involving undeveloped or vacant land whose proposed use is for multiple unit single family housing development, condominium

---

[13] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323.
[14] *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018).
[15] *Fed. Ins. Co. v. Coast Converters*, 339 P.3d 1281, 1284 (Nev. 2014).
[16] *Farmers Ins. Grp. v. Stonik*, 867 P.2d 389, 391 (Nev. 1994).
[17] *Id.*
[18] *Fed. Ins. Co.*, 339 P.3d at 1285 (brackets and citation omitted).

4

development, co-operative housing developments[,] or apartment developments consisting of 10 units or more."[19] The Cielo Vista land was vacant,[20] so this dispute centers on what its "proposed use" was. Rood acknowledges that the appraisal report discussed building a high rise on the land as its best use but argues that Gillespie appraised the land "as is"—i.e., as "raw land" that had a value that was not contingent on any future development.[21]

But several parts of Gillespie's report belie this conclusion and demonstrate that his valuation was based on the ability and plan to develop the land into a mixed-use high rise. For instance, in selecting a valuation method, the report excluded the "income approach" because "vacant land seldom generates income in the Las Vegas market . . . ."[22] So, the report instead applied the sales-comparison approach, which compares land to other recently sold parcels with comparable characteristics.[23] The "majority" of the parcels that the report chose as comparison points "were developed or were to be subsequently developed for High-Rise/Mixed-Use development"—the same "highest and best use" that the report identified for the Cielo Vista land.[24] And the report described the valuation of the land "[a]s [i]s, *with all approved zoning changes and Use Permits in place*"[25]—a reference to the fact that the city had approved the land

---

[19] ECF No. 46-1 at 18 (emphasis omitted).

[20] ECF No. 46-6 (Gillespie appraisal) at 8 (listing the "Property Type" as "Vacant land").

[21] ECF No. 47 at 13.

[22] ECF No. 46-6 at 7.

[23] *Id*.; *see also id.* at 85 ("The Sales Comparison Approach is an appraisal methodology that is based on the economic Principle of Substitution, which sets forth that a prudent buyer will pay no more for a property than the cost of obtaining an equally desirable substitute on the open market.").

[24] *Id*. at 7. Indeed, the first comparable property the report identifies is a parcel of land that would become the Juhl, a high-rise residential development in downtown Las Vegas. *Id*. at 92.

[25] *Id*. at 7 (emphasis added) (internal quotation marks omitted).

5

for a zoning variance that would have allowed Cielo Vista to build "a 37-story mixed use development, including 414 residential units and 32,970 square feet of commercial space . . . ."[26] Indeed, the approval of this "special use permit" was so central to the appraisal that the report stated that its "value opinion" would "become null and void" if the permit expired or was rescinded.[27] It is thus clear that Gillespie's appraisal was not based on raw land but on the land's capacity for becoming a high rise.

Rood also argues that the purpose of the appraisal was to facilitate a commercial loan between HRI and Cielo Vista rather than to aid either entity in actually developing a high rise.[28] He contends that, "[i]f the land value did not provide adequate protection for the refinancing, HRI never would have extended the commercial loan to Cielo Vista in the first place."[29] But Rood hasn't cited any evidence to support this conclusion, and regardless, he is attempting to draw a distinction without a difference. Application of Exclusion N does not depend on whether a real-estate development is eventually built or who the end user of Gillespie's services was. Under the exclusion's text, the only relevant factors are whether Gillespie was appraising land that was vacant or underdeveloped and whether that land's "proposed use" was the development of 10 or more of the types of housing units listed. And the proposed use of the Cielo Vista land was the development of a high rise.

Finally, Rood asserts that Exclusion N is ambiguous because it never defines the term multiple-unit single-family housing development.[30] He thus concludes that, even if Gillespie's

---

[26] *Id*. at 76 (capitalization omitted).
[27] *Id*. at 75.
[28] ECF No. 46 at 18.
[29] *Id*. (emphasis omitted).
[30] ECF No. 38 at 15–17.

6

appraisal was premised on Cielo Vista developing a mixed-use high rise with "414 residential units," it is "impossible" to determine whether these combined units constitute a multiple-unit single-family housing development. If this term was the only language that Exclusion N included, then perhaps the policy would be ambiguous. But the exclusion also lists apartment, condominium, and co-operative housing developments of 10 or more units—terms that undoubtedly describe a high rise with over 400 units. So, by appraising vacant land intended to be the site of such a development, Gillespie had no "reasonable expectation" of professional-liability coverage under his Liberty policy. I therefore find that Liberty did not breach its insurance contract with Gillespie, and I grant summary judgment in its favor.[31]

## Conclusion

Accordingly, IT IS HEREBY ORDERED that Liberty's summary-judgment motion **[ECF No. 39] is GRANTED** and Rood's summary-judgment motion **[ECF No. 38] is DENIED.** The Clerk of Court is directed to **enter judgment in favor of Liberty and CLOSE THIS CASE.**

Dated: April 5, 2019

_____
U.S. District Judge Jennifer A. Dorsey

---

[31] Because I find that Exclusion N applies, I need not and do not address Exclusion L.